UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ELIZABETH BROWN, <br> an adult individual resident of Orono, <br> County of Penobscot, and <br> State of Maine, <br><br>       Plaintiff <br><br>       v. <br><br><br> BANK OF AMERICA, N.A., <br> a Delaware corporation registered to do <br> business in Maine, with a place of business <br> in Brunswick, Cumberland County, <br> State of Maine, <br><br>  and <br><br> AETNA INC., a Connecticut corporation <br> registered to do business in Maine under <br> the name of its subsidiary, AETNA <br> LIFE INSURANCE COMPANY, with <br> a registered agent in Readfield, located <br> in Kennebec County, State of Maine, <br><br>       Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | <br><br><br><br><br><br><br> CASE NO. 1:13-CV-00367-JAW |

## AMENDED COMPLAINT AND REQUEST FOR JURY TRIAL

Elizabeth Brown makes the following complaint against Bank of America, N.A., ("BOA") and Aetna Inc. and Aetna Life Insurance Company ("Aetna"). She requests a jury trial.

### Parties

1.     Plaintiff Elizabeth Brown is a female citizen of the State of Maine, living in the County of Penobscot.

2.     Bank of America, N.A., ("BOA") is a Delaware corporation registered to do business in Maine with a registered agent in Readfield, Maine, and a place of doing business in Brunswick, Maine, which is located in Cumberland County.

3. Aetna Inc. is a Connecticut corporation. Aetna is the brand name for products and services provided by one or more of the Aetna group of subsidiary companies. Aetna Life Insurance Company is a subsidiary of Aetna Inc. (collectively "Aetna") and is registered to do business in Maine with a registered agent in Readfield, which is located in Kennebec County.

4. Aetna was specifically authorized by BOA to handle requests for leave and other accommodations for BOA and to gather medical information from employees for such purposes. Aetna is BOA's "Leave Administrator."

5. Both BOA and Aetna gathered and possessed personnel file documents regarding Brown, documents covered by 26 M.R.S.A. § 631.

6. Venue properly lies in Cumberland County pursuant to 4 M.R.S.A. § 155.

7. Each defendant has had 500 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as, or in the calendar year prior to, when the discrimination alleged in this case occurred.

## Procedural background

8. This is a proceeding for declaratory and injunctive relief and monetary damages to redress the deprivation of rights secured to plaintiff by the Americans with Disabilities Act ("ADA") and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12101 *et seq.*, and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*, and the Maine personnel files law, 26 M.R.S.A. § 631.

9. Brown filed a timely complaint with the Maine Human Rights Commission .

10. The Commission investigated the complaints and found that there were reasonable grounds to believe that unlawful discrimination occurred. The Commission subsequently endeavored to eliminate such discrimination by informal means such as conference, conciliation, and persuasion, but those efforts were unsuccessful.

11. The Commission failed, within 90 days after finding reasonable grounds to believe that unlawful discrimination occurred, to enter into a conciliation agreement to which Brown was a party. It issued a Conciliation Failed letter on July 29, 2013. Brown has timely filed this complaint within 90 days of the issuance of the Conciliation Failed letter.

12. The EEOC has issued a right to sue notice to Brown. Brown has thus exhausted all her administrative remedies.

13. This Court has jurisdiction over this action pursuant to 5 M.R.S.A. §§ 4613(1), 4621.

## Jury demand

14. Plaintiff Brown demands trial by jury of all claims to the extent allowed by law.

## Factual background

15. In 2009, Brown began work at the Bank of America as a Collector in the Bank's call center in Orono, Maine.

16. On September 17, 2010, she was physically and sexually assaulted by a fellow male worker, Clukey, at a social event on the University of Maine campus. Her attacker had also threatened to "chop into little bits" another student who tried to intervene to help Brown.

17. On September 18, Brown met with the president of the fraternity where it happened to let him know about the attack. On Sunday, Brown called the police and went in to meet with a detective.

18. On September 20, Brown went into work, distraught. The secretary connected her by phone with the unit manager, Nicole Kelley-Sirois. Brown told the unit manager what had happened. The unit manager asked Brown if she was okay and Brown said no. Brown was sent home and told to take the week (unpaid) and told that BOA would check in with her after they talked to her attacker.

19.     Several days later, on September 21, Brown received a call from the unit manager Kelley-Sirois saying she had met with the attacker and had told him to stay away from Brown and not to speak to her.  Brown asked the manager why her attacker was still allowed to be there after assaulting her but Kelley-Sirois said she couldn't discuss it.  Brown reported she didn't feel safe coming to work under those circumstances.

20.     Brown's time out from work was unpaid.  The bank did not offer paid time.

21.     During this call with the unit manager, Brown said she wasn't okay with Clukey, her attacker, sitting near her.  She asked that he be moved and not allowed to be sitting near her.  Their work area was all one room separated only with cubicles.  In response to this request for an accommodation, the manager Kelley-Sirois said that she had told him not to have contact with Brown, and had told all the fraternity brothers who worked there not to have contact with Brown but that she otherwise wasn't going to discuss anything further about his employment.

22.     Around this time, Brown was meeting nearly every day with a provider at the Safe Campus Center.  Kelley-Sirois knew this because she asked if Brown was seeing anyone and Brown said yes.

23.     On September 22, Brown was at the University of Maine Safe Campus office with a therapist discussing a safety plan, including accommodations so she would feel safe.  They called the BOA Advice & Counsel number that unit manager Kelley-Sirois had given to Brown.  (Advice & Counsel was also the department that employees were supposed to call for accommodations for disabilities, according to BOA's own personnel handbook.)  Brown told them all the details of what happened and her therapist told them that they needed to create a safety plan.  BOA refused to continue the conversation with the therapist participating.  They were most concerned if Brown was pressing charges.  BOA's Advice & Counsel would not set up a safety plan for Brown to allow her to return or discuss an accommodation.  Instead they told

her that she would have to talk to her manager about a safety plan (even though her manager had told her to call Advice & Counsel). They told her to call back only if she decided to press criminal charges against Clukey.

24. Because of the attack, Brown was suffering from panic attacks, difficulty sleeping, and mood swings. Later she was diagnosed with PTSD.

25. On September 26, Brown called in to discuss her status with Kelley-Sirois but she wasn't able to reach anyone so she left a message. Brown called in again later to see if she could reach anyone this time, but she wasn't able to. She called Sunday night to talk about not returning to work Monday morning because no arrangement had been made yet about not being near her attacker and she hadn't been able to connect with Kelley-Sirois either. Kelley-Sirois also had not returned her calls, which was getting distressing. No one called her back on Monday morning.

26. On September 27, Brown called Kelley-Sirois to let her know she was applying for leave and she would not be returning to work yet. Brown told Kelley-Sirois that she still did not feel safe and she wasn't mentally able to return to work knowing her attacker, Clukey, was still employed there. They agreed on weekly phone conversations (on Fridays) to discuss her status. Brown told Kelley-Sirois that she was meeting with the doctors, that she had had depression before, that the doctors thought she was having it again, and that she was having panic attacks and extreme anxiety when she thought about having to come back to work with Clukey right there. Brown repeated that she did not feel safe. Kelley-Sirois said she wanted Brown to send her medical records to support the statement about her depression. In response to that request, Brown did have her doctor (Dr. Stewart) send BOA her medical records.

27. On October 1, Brown called her manager as per their agreement to discuss her status. She told Kelley-Sirois that she still felt unsafe and that she was meeting with a counselor

on campus, as well as seeing a doctor for injuries from the assault.  In addition, Brown requested, as part of a safety plan for her to return to work, that Clukey be moved.  She said she felt unsafe with him being right next to her and she wanted him placed away from her in order for her to return to work.  It was in this conversation that she shared her diagnosis of "situational depression" and "consider PTSD" with Nicole.  ("Consider PTSD" means that she had all the symptoms but the provider/doctor couldn't diagnose it yet because it hadn't gone long enough to confirm the diagnosis.)  Brown also shared that she had been injured in the assault and she was on medication for these injuries.  She had suffered deep bruising to her back and arms, and strained muscles and bruising on her neck and had trouble sleeping as well.  Kelley-Sirois just said, "Ok."

28.     BOA, despite the request for an accommodation to Advice & Counsel and the calls and requests to the unit manager, Kelley-Sirois, didn't take any action to resolve the problem or accommodate or discuss Brown's request.  BOA never called Brown back.

29.     On October 8, Brown called in for her weekly check-in but was unable to reach anyone so she left a message.  In her message, she asked that BOA give her a call back so they could discuss how she was doing (her return to work date, any status on moving/firing Clukey, and her mental status).  BOA never returned the call.

30.     On October 15, Brown called in for her weekly check-in but again wasn't able to reach anyone, so she left a message.  Brown left a message requesting a return call to discuss her status and possible return to work date and arrangement.  BOA never returned the call.

31.     No one was answering the phone calls and no one was responding to Brown's multiple voicemail messages.  She was worried about how she was going to get back to work if no one returned her calls.  To Brown, it sent a message to Clukey that what he had done was

okay.  Furthermore, there was no response by BOA to Brown's request for an accommodation, or even an attempt to discuss an accommodation that would allow her to return to work.

32.    Brown's requests for an accommodation were reasonable.  Indeed, the University of Maine, in contrast to BOA, met promptly with Brown, arranged her schedule so that she would not be near her attacker, and limited her attacker on where he could go and what buildings he could be in, as well as issued him a warning that made those limits clear.  As a result, Brown was able to return to school and attend classes; in contrast, she was unable to return to work given BOA's refusal to discuss, let alone provide, a safety plan as the University had.

33.    On October 15, Brown's doctor, Dr. Stewart, faxed an FMLA form to Aetna for leave from work at BOA.

34.    On October 18, Brown called BOA's agent, Aetna, to find out what documentation she needed to do for short term disability and FMLA leave.  BOA had authorized Aetna to handle disability and FMLA claims for BOA.  Aetna said it needed medical records or counseling records stating why she was unable to perform her job.  Aetna didn't tell her she needed to provide an evaluation from a psychiatrist in that conversation, so her short term disability was denied due to insufficient documentation.  (Brown appealed it and was denied again, so she got a psychiatric evaluation and they denied it that time because she hadn't gotten the paperwork done at the correct time.)  The psychiatric evaluation that went to Aetna, BOA's agent, indicated that Brown had PTSD.

35.    On October 22, Brown called in for her weekly check-in but couldn't reach anyone so she left a message.  The same day, she called again, this time to another number to see if someone would answer that time.  They didn't.  No one returned her call.

36.    On November 5, Brown called for her Friday check-in, but she didn't get an answer so she left a message.  Friday nights were when most people were working, which is one

of the best days for collections, so there were always multiple managers there. Someone always checks the voicemail throughout the day and night shifts, so they know who is calling out, running late, is sick, etc. Despite that, no one answered and no one returned Brown's call.

37. On November 12, as instructed by her unit manager, Brown called in for her Friday check-in. Once again Brown wasn't able to reach anyone so she left a message. She said she was calling in for her check-in, she wanted to let them know how she was doing, and to please return her call. BOA did not return this call either.

38. On November 18, 2010, Clukey pled guilty to assault and furnishing alcohol to a minor.

39. On November 19, 2010, Brown called in for her Friday check-in. She didn't get in touch with anyone so she left a message saying that Clukey had pled guilty to assault and furnishing alcohol to a minor. At this point, BOA was on notice that Clukey had lied to the Bank when he told them he "did not assault Miss Brown." Despite Clukey lying about committing a crime and the Bank now knowing it, the Bank took no action that Brown was aware of. The Bank could have moved him to its Orono bank branch or another location but chose not to, even though it knew now that Brown was a victim of his assault.

40. On November 21, according to BOA, Aetna called Brown and left a voicemail. Brown's phone records do not reflect that.

41. On November 23, according to BOA, Aetna called Brown a second time and left a voicemail. Again, there was no phone record of such a call.

42. On November 24, according to BOA, Aetna called Brown a third time, but there is no record of that call either.

43. On December 3, Brown called for her Friday check-in. She did not get a response. She left a message but BOA did not call back. No one at BOA called to tell her anything about Aetna trying to reach her either, if it ever had been.

44. On that same day, December 3, despite Brown's call that very day and all her other calls, BOA manager Juanita Gilbert sent out a message to Risk Operations Team Manager Barbara Asquith and Unit Manager Nichole Kelley-Sirois asking if anyone had heard from Brown and could she send out "the AWOL letter." Despite a log of Brown's calls, no one answered that Brown had been calling in. As a result, the AWOL letter was sent out.

45. On December 7, Brown called Aetna and had a 14 minute phone call. Brown believes this call was to find out why she had been denied short term disability. During this phone call, Aetna never mentioned trying to reach Brown by phone and leaving messages.

46. On December 7, Brown called BOA to see why she had not received a return call from any of her messages. The last time she had spoken with her unit manager was October 1, 2010, and she had left seven (7) messages since then. She was not able to reach anyone so she left yet another message. At 4:08 p.m. she called again and still wasn't able to reach anyone.

47. On December 8, 2010, a letter was sent by Barbara Asquith, Risk Operations Team Manager for BOA, saying Brown needed to provide more medical information to Aetna to justify continued leave. On December 9, Brown called her doctor's office and asked them to fax BOA/Aetna more documentation to substantiate her leave.

48. The December 8 letter falsely stated that Brown had failed "to follow call-in procedures" and had not "provide[d] an acceptable reason for [her] continued absence."

49. Such a false reason was pretext on the part of both BOA and Aetna, from which BOA had gotten false information about Brown's contacts, adherence to procedures, and reasons for her absence.

50. On December 10, Brown called Aetna again. She informed them that she received the Dec. 8 letter saying that even more medical documentation was needed, confirming that she had sent medical information, and asking if they had received it and if there was anything else they needed. They said they needed documentation on why more leave was needed. Brown said she would be sending more documentation over and, when they received it, to let her know if it was enough. She did not get any response back from Aetna telling her that more information was needed.

51. On December 10, Brown called in for her Friday check-in. She had not received a return call from any of her messages. She was not able to get in touch with anyone and she left another message. In this message, she referenced the Dec. 8 letter she had received from manager Barbara Asquith stating that she would be terminated if she did not provide more medical documentation. She stated that her doctor had provided the documentation needed.

52. In this message, Brown also asked for a return call to discuss her return to work accommodations. BOA did not return her call, even though her manager had agreed on Friday calls and even though Brown was now getting messages threatening to terminate her for "failure to follow call-in procedures."

53. On December 17, Brown called in for her Friday check-in. Brown had not received a return call from any of her messages thus far. She was not able to get in touch with anyone so she left a message. She stated that she had not heard back from anyone and would like a return call.

54. On December 24, Brown called in for her Friday check-in and left another message. She again mentioned that she was waiting for a return call and she asked that, after the holidays, someone give her a call to discuss her return to work.

55. In January of 2011, Brown did not call in for Friday check-ins because she had not received any return calls from BOA since October of the prior year.

56. On January 27, 2011, according to BOA, Aetna called Brown and left a message. Brown's phone records do not show a call.

57. On January 28, according to BOA, Aetna called Brown a second time and left a message. Again, her phone records do not show a call.

58. On February 2, according to BOA, Aetna called Brown a third time. Her phone records do not show this call.

59. On February 7, Aetna emailed BOA informing BOA that Brown was being placed on a "LOA-closed" status and directing BOA to take action within three days.

60. On February 10, 2011, Brown received a letter dated February 8 stating that her employment would be separated on February 18, 2011, if she did not return to work or provide more medical documentation. At that point, still no one had returned her calls. Her unit manager was refusing to return her calls to discuss a safety plan for her mental health to allow her to return.

61. Brown didn't call in response to this letter because BOA hadn't returned her calls for months and were refusing to discuss moving her attacker's location to allow her to go back to work. Brown needed that accommodation for her PTSD. There was nothing in Ms. Asquith's Feb. 8 letter that suggested any willingness to talk about her need for an accommodation.

62. Neither BOA nor its agent Aetna made any efforts, in consultation with Brown, to identify and make a reasonable accommodation that would provide her with an opportunity to return to work.

63. The February 8 letter falsely stated that Brown had failed "to follow call-in procedures" and had not "provide[d] an acceptable reason for [her] continued absence."

11

64. Such a false reason was pretext on the part of both BOA and Aetna, from which BOA had gotten false information about Brown's contacts, adherence to procedures, and reasons for her absence.

65. On February 23, 2011, Brown's employment was terminated.

66. As a result of the discriminatory treatment of her while employed and the subsequent termination of her, Brown suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

67. Brown also lost back pay and interest on back pay and the benefits associated with employment.

## Count I
## Disability Discrimination under the ADA and ADAAA

68. Plaintiff realleges and hereby incorporates by reference the above paragraphs as if set forth in their entirety.

69. Brown is a person with a disability as defined by the ADA and ADAAA, 42 U.S.C. § 12102.

70. Brown, with a reasonable accommodation for her disability, was able to perform the essential functions of the employment position that she held with BOA.

71. Defendants refused to engage in an interactive process with Brown to discuss a reasonable accommodation, despite multiple requests by her for a safety plan to allow her to return to work. That refusal violated the ADA and ADAAA as well as the applicable federal regulations. 29 C.F.R. § 1630.2(*o*)(3) (2011).

72. Had defendants engaged in an interactive process, they could have found a reasonable accommodation that would have enabled Brown to perform her job's essential functions.

73. Brown, with a reasonable accommodation for her disability, was able to perform the essential functions of the employment position that she held with BOA.

74. Defendants knew of Brown's disability, refused to make or even discuss a reasonable accommodation, and cannot demonstrate that the accommodation requested would have imposed an undue hardship on the operation of either BOA or Aetna.

75. Brown explicitly identified her disability to management and requested a safety plan as a reasonable accommodation. The safety plan would have enabled her to return to work just as such a plan enabled her to return to college.

76. The ADA requires employers to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). An employer's refusal to provide a reasonable accommodation to a disabled employee is disability discrimination.

77. Defendants fired Brown because of her disability and her need for a reasonable accommodation for that disability.

78. BOA and Aetna discriminated against Brown because of her disability.

79. Defendants acted with malice or with reckless indifference to the rights of Brown.

### Count II
### Disability Discrimination under the MHRA

80. Plaintiff realleges and hereby incorporates by reference the above paragraphs as if set forth in their entirety.

81. Brown is a qualified individual with a disability as defined by 5 M.R.S.A. § 4553-A. A qualified person with a disability is defined as "[a]n individual with a physical or mental illness who, with or without reasonable accommodation can perform the essential functions of the employment position that the individual holds or desires." 5 M.R.S.A. § 4553(8-D).

82. Brown, with a reasonable accommodation for her disability, was able to perform the essential functions of the employment position that she held with BOA.

83. Defendants knew of Brown's disability, refused to make or even discuss a reasonable accommodation, and cannot demonstrate that the accommodation requested would have imposed an undue hardship on the operation of either BOA or Aetna.

84. Defendants made no efforts, in consultation with Brown, to identify and make a reasonable accommodation that would have allowed her to return to work and would not have caused an undue hardship on the operation of the business.

85. The Maine Human Rights Act requires an employer to make reasonable accommodations for the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee. 5 M.R.S.A. § 4553(2). Failure to provide a reasonable accommodation constitutes discrimination. Brown was a qualified individual with a known disability and the accommodation requested would not have constituted an undue hardship.

86. Defendants fired Brown because of her disability and her need for a reasonable accommodation for that disability.

87. BOA and Aetna discriminated against Brown because of her disability.

88. Defendants acted with malice or with deliberate conduct that, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward Brown can be implied.

## Count III
### Violation of Maine's Personnel Files Law, 26 M.R.S.A. § 631

89. Plaintiff realleges and hereby incorporates by reference the above paragraphs as if set forth in their entirety.

90. On July 19, 2011, Brown made a written request for her personnel file. Neither BOA nor Aetna produced any of Brown's personnel documents in response to that request.

91. On March 17, 2013, Brown made another written request for her personnel file, specifically citing 26 M.R.S.A. § 631. That request included a release allowing BOA and Aetna to produce to Brown's attorney personnel documents in the possession of both BOA and Aetna.

92. Section 631 of Title 26 only requires that the request be in writing and that the person making the request is the employee or a "duly authorized representative." Brown's attorney was not only such a representative but the release provided to BOA and Aetna made that clear and neither defendant has ever questioned that Brown's attorney was so authorized. Instead, they have refused to produce all documents, claiming that additional releases under HIPAA must be signed first.

93. BOA and Aetna produced only a portion of Brown's file, omitting, among other things, medical records and leave requests that were directly related to Brown's existing Maine Human Rights Commission complaint. An email was sent to BOA on April 5, 2013, requesting that the full file be produced as required by 26 M.R.S.A. § 631.

94. On May 3, BOA responded that further records at Aetna were not being produced from Brown's personnel file until a "HIPPA" release was signed. Although Brown responded that neither defendant was covered by HIPAA and that the 26 M.R.S.A. § 631 did not permit personnel records to be withheld on such a basis, both BOA and Aetna refused to produce the documents (originally requested in both July 2011 and March 2013).

95. Defendants have thus to date refused to produce Brown's complete personnel file.

96. Brown has provided several releases for her file pursuant to 26 M.R.S.A. § 631.

97. Any employer who, following a request pursuant to § 631, without good cause fails to comply within 10 days of receipt of that request, is subject to a civil forfeiture of $25 for

15

each day that a failure continues.  Equitable relief, including an injunction, is also permitted as well as reimbursement for costs of suit including a reasonable attorney's fee.

98.     Brown demands an injunction requiring the production of her full personnel file, the full civil forfeiture available for each of defendants' violations of § 631, as well as reimbursement for court costs and her attorneys' fees.

### **PRAYER FOR RELIEF**

WHEREFORE, Brown prays that this Court enter an Order providing as follows:

A.      Enter judgment declaring that the defendants' practices complained of herein are unlawful as alleged;

B.      Grant Brown a permanent injunction enjoining defendants, their officers, agents, successors, employees, attorneys and assigns and other representatives, and all persons acting in concert with them and at their direction, from engaging in any employment policy or practice which retaliates against Brown;

C.      Order defendants to make Brown whole by providing reinstatement and/or front pay, appropriate back pay, and reimbursement for lost pension, health, Social Security, and other benefits in amounts to be shown at trial;

D.      Order defendants to pay Brown compensatory damages for non-pecuniary losses, including, but not limited to, pain and suffering, psychological upset, and interference with the enjoyment of life;

E.      Order defendants to pay Brown punitive damages;

F.      Order defendants to pay Brown civil penal damages pursuant to 5 M.R.S.A. § 4613(2)(B)(7);

G.      Order defendants to pay all litigation costs and expert witness fees;

H.	Order defendants to pay Brown nominal damages;

I.	Order defendants to pay pre-judgment, post-judgment interest, and reasonable attorneys' fees to Brown; and

J.	Grant such additional relief as this Court deems appropriate.

/s/Rebecca S. Webber, Esq.
_____
Rebecca S. Webber, Esq., Bar No. 7908
Attorney for Plaintiff Elizabeth Brown
SKELTON TAINTOR & ABBOTT
95 Main Street
Auburn, ME 04210
(207) 784-3200
rwebber@sta-law.com

Dated:   September 30, 2013