UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ELIZABETH BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:13-cv-00367-JAW |
| | ) | |
| BANK OF AMERICA, N.A., et al., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING DEFENDANT AETNA LIFE INSURANCE COMPANY'S MOTION TO DISMISS

At a party outside of work, one of Elizabeth Brown's male co-workers sexually assaulted her. Ms. Brown alleges that, fearful of returning to work with the co-worker and suffering from physical and psychological after-effects of the assault, she tried to reach a workplace accommodation with her employer, Bank of America, N.A. (BOA), but BOA refused to make reasonable accommodations and later terminated her for absenteeism. Ms. Brown sued BOA and its employee benefits administrator, Aetna Life Insurance Company, alleging disability discrimination under the Americans With Disabilities Act and the Maine Human Rights Act. She also alleges a violation of Maine's personnel files law. Before the Court is Aetna's Motion to Dismiss. Assuming the truth of the allegations in the Amended Complaint, the Court concludes that the Amended Complaint survives dismissal.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." In other words, "[i]f a plaintiff's claims do not establish recognized legal theories for which relief may be granted, the court must dismiss the complaint." *Beebe v. Williams College*, 430 F. Supp. 2d 18, 20 (D. Mass. 2006). In deciding a motion to dismiss, the Court must "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 41 (1st Cir. 2009) (internal quotations omitted). If, after such a generous reading, the complaint supports a "reasonable inference that the defendant is liable for the misconduct alleged," the complaint must survive dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II. FACTS

### A. Procedural Posture

Ms. Brown filed her original Complaint in Maine Superior Court on September 6, 2013, but BOA removed the case to this Court on September 30, 2013 based on both the Court's diversity and federal question jurisdiction. *Notice of Removal* (ECF No. 1). Ms. Brown amended her Complaint on the same day, *Am.*

*Compl.* (ECF No. 4), and served a summons on Aetna the following day. *Summons* (ECF No. 6) (Oct. 1, 2013).

Aetna moved to dismiss the Amended Complaint as against itself on November 7, 2013. *Def.'s Mot. to Dismiss* (ECF No. 18) (*Def.'s Mot.*). Ms. Brown opposed the motion on November 24, 2013, *Resp. to Aetna's Mot. to Dismiss* (ECF No. 22) (*Pl.'s Opp'n*), and Aetna replied to her opposition on December 9, 2013. *Reply Mem. in Further Support of Def.'s Mot. to Dismiss* (ECF No. 26) (*Def.'s Reply*).

### B.    The Allegations of the Amended Complaint

The Court accepts the following facts from the Amended Complaint as true for the purpose of this motion:

#### 1.    Background

Beginning in 2009, BOA employed Ms. Brown as a "Collector" at its call center in Orono, Maine. *Am. Compl.* ¶ 15. On September 17, 2010, she was physically and sexually assaulted by a co-worker, a Mr. Clukey,[1] at a social event on the University of Maine campus. As a result of the attack, Ms. Brown suffered panic attacks, difficulty sleeping, mood swings, and Post-Traumatic Stress Disorder (PTSD). *Id.* ¶ 24.

#### 2.    Ms. Brown's Absence From Work

On September 20, 2010, Ms. Brown went in to work at the call center and advised her manager, Nicole Kelley-Sirois, what had happened. *Id.* ¶ 18. Ms. Kelley-Sirois asked Ms. Brown if "she was okay," and Brown said "no." *Id.* Ms. Kelley-Sirois sent Ms. Brown home, told her to take a week off without pay, and

---

[1]    The Amended Complaint does not identify Mr. Clukey's first name.

told her that BOA would check in with her after they talked with Mr. Clukey. *Id.*

On September 21, Ms. Kelley-Sirois called Ms. Brown and informed her that she had met with Mr. Clukey and told him to stay away from Ms. Brown, and not to speak to her. *Id.* ¶ 21. Ms. Brown, who did not feel safe working near Mr. Clukey, asked that he be moved to a more distant cubicle in the common room in which they worked. *Id.* ¶¶ 19, 21. Ms. Kelley-Sirois refused that request, reiterating that she had directed Mr. Clukey and "all the fraternity brothers who worked there" to have no contact with Ms. Brown. *Id.* ¶ 21.

On September 22, Ms. Brown discussed a safety plan with a therapist at the University of Maine Safe Campus office. *Id.* ¶ 23. During that meeting, Ms. Brown and the therapist called BOA "Advice & Counsel," (BOA Advice & Counsel), the BOA office responsible for accommodations for disabilities. *Id.* The person with whom Ms. Brown spoke "refused to continue the conversation with the therapist participating" and was "most concerned if [Ms.] Brown was pressing charges." *Id.* BOA Advice & Counsel "would not set up a safety plan for [Ms.] Brown to allow her to return or discuss an accommodation." *Id.*

On September 27, Ms. Brown advised Ms. Kelley-Sirois that she would not yet return to work and would be applying for leave, since she did not feel safe and was mentally unable to return to work knowing that Mr. Clukey was still employed at her call center. *Id.* ¶ 26. Ms. Brown and Ms. Kelley-Sirois agreed that they would have a phone conversation every Friday to "discuss her status." *Id.* During the September 27 telephone call, Ms. Brown informed Ms. Kelley-Sirois that her

doctors thought she had depression, panic attacks, and extreme anxiety "when she thought about having to come back to work with [Mr.] Clukey right there." *Id.* Ms. Kelley-Sirois requested medical records to support these statements, and Ms. Brown directed her doctor to supply those records to Ms. Kelley-Sirois. *Id.*

On October 1, Ms. Brown called Ms. Kelley-Sirois and told her that she was still seeing a counselor and a doctor for her injuries from the assault. *Id.* ¶ 27. She reported that she still felt unsafe returning to work with Mr. Clukey "being right next to her" and that "she wanted him placed away from her in order for her to return to work." *Id.* She informed Ms. Kelley-Sirois that her doctor had diagnosed her with situational depression and had identified symptoms of PTSD. Ms. Brown also told Ms. Kelley-Sirois that she had been physically injured in the attack and was taking medications for those injuries. *Id.*

On October 8 and 15, Ms. Brown left voicemail messages as part of her agreed weekly status calls. *Id.* ¶¶ 29-30. BOA did not return those calls. *Id.* Ms. Brown felt that this "sent a message to [Mr.] Clukey that what he had done was okay," and she surmises that "there was no response by [BOA] to [her] request for an accommodation, or even an attempt to discuss an accommodation that would allow her to return to work." *Id.* Ms. Brown again called and left messages, with no response from BOA, on October 22, November 5, November 12, November 19, December 3, and December 7, 2010. *Id.* ¶¶ 35-37, 39, 43, 46.

### 3. Ms. Brown's Claims for Leave and Short-Term Disability Benefits

BOA had authorized Aetna to handle disability and "FMLA" claims. *Id.* ¶ 34.[2] On October 15, Ms. Brown's doctor faxed "an FMLA form" to Aetna "for leave from work at [BOA]." *Id.* ¶ 33. Ms. Brown called BOA's agent Aetna on October 18 to find out what documentation she needed to provide to obtain short-term disability (STD) and FMLA leave. *Id.* ¶ 34.[3] Aetna informed Ms. Brown that it needed medical records or counseling records stating why she was unable to perform her job. *Id.*[4] Aetna denied Ms. Brown's claim for STD benefits and upheld its denial on appeal. *Id.*

The Amended Complaint alleges that, "according to [BOA]," Aetna called Ms. Brown on November 21, 23, and 24, leaving voicemails on the 21st and 23rd, but that Ms. Brown's phone records do not reflect these calls. *Id.* ¶¶ 40-42.

---

[2]     The Complaint does not define "FMLA," but the Court assumes it refers to the Family and Medical Leave Act of 1993, 107 Stat. 6 (codified as amended at 29 U.S.C. §§ 2601 *et seq.*). Section 103(a) of the Act, codified at 29 U.S.C. § 2613(a), permits an employer to require that an employee requesting leave provide a "certification issued by the health care provider of the eligible employee."

[3]     Paragraph 34 of the Amended Complaint refers to Aetna several times as "[Bank of America's] agent, Aetna." *Am. Compl.* ¶ 34. Whether Aetna was the BOA's agent is a mixed question of fact and law. The Court has included the agency allegation to the extent it alleges a fact, but the Court is not required to accept her assertions of law.

[4]     Paragraph 34 also states:

> Aetna didn't tell [Ms. Brown] she needed to provide an evaluation from a psychiatrist in that conversation, so her short term disability was denied due to insufficient documentation. (Brown appealed it and was denied again, so she got a psychiatric evaluation and they denied it that time because she hadn't gotten the paperwork done at the correct time.) The psychiatric evaluation that went to Aetna, BOA's agent, indicated that Brown had PTSD.

*Am. Compl.* ¶ 34. However, as Ms. Brown concedes that she is not seeking damages from Aetna for wrongful denial of her short-term disability claim, *Pl.'s Opp'n* at 10-11, these additional facts are technically irrelevant to the motion to dismiss as to Aetna. To provide context, the Court has recited a condensed version of them.

On December 8, Barbara Asquith, a Risk Operations Team Member at BOA, sent Ms. Brown a letter telling her that she needed to provide more medical information to Aetna to justify continuing leave. *Id.* ¶ 47. The next day, Ms. Brown called her doctor's office and asked them to fax "BOA/Aetna" more documentation to substantiate her leave. *Id.* On December 10, Ms. Brown called Aetna to discuss the December 8 letter. *Id.* ¶ 50. Aetna informed her that they needed further documentation on why Ms. Brown required more leave; Ms. Brown told them that she would send it, and asked them to "let her know if it was enough." *Id.* After this exchange, Aetna did not respond to Ms. Brown to tell her that more information was needed. *Id.*

On February 7, 2011, Aetna emailed BOA, informing it that Ms. Brown "was being placed on a 'LOA-closed' status and directing [BOA] to take action within three days." *Id.* ¶ 59.

### 4. Ms. Brown's Termination

On December 3, 2010, BOA manager Juanita Gilbert sent a message to Ms. Asquith and Ms. Kelley-Sirois asking if anyone had heard from Ms. Brown. *Id.* ¶ 44. The purpose of this inquiry was to determine if she could send out "the AWOL letter." *Id.*[5] Neither Ms. Asquith nor Ms. Kelley-Sirois indicated that Ms. Brown had been calling in; consequently, "the AWOL letter was sent out."[6] Ms. Brown

---

[5]     Although not defined in the Amended Complaint, "AWOL" in paragraph 44 must refer to "absent without leave."

[6]     Paragraph 44 of the Amended Complaint does not specify who sent the AWOL letter or when it was sent. It also claims that Ms. Asquith and Ms. Kelley-Sirois answered the question in the negative "[d]espite a log of Brown's calls," but it is not clear what this log was, who possessed it, or what was in it.

continued to call BOA for her weekly check-ins on December 10, 17, and 24; she left messages on each occasion, but never received a return call. *Id.* ¶¶ 51-54. As of January, 2011, Ms. Brown stopped calling for her weekly check-ins, because she had not received a return call from BOA since October, 2010. *Id.* ¶ 55.

The Amended Complaint alleges that, "according to [BOA]," Aetna called Ms. Brown on January 27, January 28, and Feburary 2, 2011, but that Ms. Brown's phone records do not show any indication of these calls. *Id.* ¶¶ 56-58.

On February 10, 2011, Ms. Brown received a letter from BOA dated February 8, 2011, advising her that her employment would be "separated" as of February 18, 2011, if she did not return to work or provide additional medical documentation. *Id.* ¶ 60. Ms. Brown did not respond to this letter because "[t]here was nothing in [the letter] that suggested any willingness to talk about [Ms. Brown's] need for an accommodation." *Id.* ¶ 61. Neither BOA nor its agent Aetna made any efforts, in consultation with Ms. Brown, to identify and make a reasonable accommodation that would provide her with an opportunity to return to work. *Id.* ¶ 62.[7] BOA terminated Ms. Brown's employment on February 23, 2011. *Id.* ¶ 65.[8]

### 5. Ms. Brown's Request for Her Personnel Files

On July 19, 2011, Ms. Brown made a written request for her personnel file, though the Amended Complaint does not specify to whom she addressed this request. *Id.* ¶ 90. At any rate, neither BOA nor Aetna produced any of her

---

[7]    Paragraph 62 contains mixed questions of fact and law. The Court included paragraph 62 to the extent it alleges facts, but the Court is not required to accept her assertions of law.

[8]    Paragraph 65 states that "Brown's employment was terminated." The Court draws the only reasonable inference from this statement—that her employer, Bank of America, did the terminating.

personnel documents in response to that request. *Id.* Nearly two years later, on March 17, 2013, Ms. Brown made another written request for her personnel file, though again the Amended Complaint does not identify the recipient of this request. *Id.* ¶ 91. This request included a release purporting to allow BOA and Aetna to produce to Ms. Brown's attorney certain personnel documents "in the possession of both [BOA] and Aetna." *Id.* BOA and Aetna produced a portion of Ms. Brown's file, but omitted medical records and leave requests related to Ms. Brown's complaint, which was then before the Maine Human Rights Commission.[9] *Id.* ¶ 93. Someone—the Amended Complaint does not identify who—sent an email to BOA on April 5, 2013, requesting the full file; however, BOA replied on May 3 that "further records at Aetna were not being produced from [Ms.] Brown's personnel file until a 'HIPAA' release was signed."[10] *Id.* ¶ 94.

## III.  COUNT I:  ADA DISABILITY DISCRIMINATION

### A.    Position of the Parties

#### 1.    Aetna

Aetna makes two basic arguments in support of dismissal of Count I as against itself. It argues first that Aetna is not a proper defendant in an ADA discrimination action, and second that it cannot be held liable as BOA's agent for any civil wrongs committed by BOA as Ms. Brown's employer. *Def.'s Mot.* at 7-14, 16-18.

---

[9]    The Maine Human Rights Commission accepts, investigates, and in some cases prosecutes complaints from persons who claim to have been subjected to unlawful discrimination in Maine. *See generally* ME. REV. STAT. tit. 5, §§ 4611-14.

[10]    Presumably, the Health Insurance Portability and Accountability Act, 110 Stat. 1936 (Aug. 21, 1996), *codified at* 42 U.S.C. § 300gg *et seq.*, 29 U.S.C § 1181 *et seq.*, and 42 U.S.C § 1320d *et seq.*

On the first point, Aetna claims that it is not a "covered entity" under the ADA because it is a third-party benefit claim administrator, not an employer. *Id.* at 8. According to the terms of the complaint, Aetna observes, BOA hired Aetna to administer disability and leave claims. *Id.* at 9. This makes it, by definition, not Ms. Brown's "employer." *Id.* Next, Aetna argues that even if it were a "covered entity" under the ADA, it would be shielded from liability by the safe harbor provisions of 42 U.S.C. § 12201(c). *Def.'s Mot.* at 11. This is so, in Aetna's view, because "Aetna administered the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance." *Id.* at 12. Aetna argues that BOA's benefit plan was not "subject to State laws that regulate insurance" because § 502(a) of the Employee Retirement Income Security Act (ERISA)[11] completely preempts any such state law. *Id.* at 12-13.

Aetna also disputes any liability based on an agency relationship with BOA. Although the Amended Complaint alleges that Aetna was BOA's "agent," *Am. Compl.* ¶¶ 34, 62, Aetna views this allegation as conclusory and insufficient to establish agency under federal pleading standards. *Id.* at 16-17 (citing *Twombly*, 550 U.S. at 555, and *Caban-Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)). Aetna notes that in order to establish that it was an agent of BOA, the Amended Complaint would have to allege (1) that BOA authorized Aetna to act for it; (2) that Aetna consented to do so; and (3) that BOA would exert some control over

---

[11] The Employee Retirement Income Security Act of 1974, Pub L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. §§ 1001 *et seq.*) (ERISA), ERISA § 502(a) is codified at 29 U.S.C. § 1132(a).

Aetna's actions. *Id.* at 17 (citing *State Farm Mut. Auto Ins. Co. v. Koshy*, 2010 ME 44, ¶ 16, 995 A.2d 651). Aetna then argues that the Amended Complaint failed to allege any facts that would meet these elements. *Id.*

Even if the Amended Complaint did allege an agency relationship, Aetna argues, it also failed to establish grounds to impose liability on Aetna as BOA's agent. It asserts that "[w]hen an agent is not party to a contract between a principal and a third party, the agent is not liable to the third party for any breach of that contract." *Id.* at 18 (citing *Grande v. St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277, 280 (1st Cir. 2006) and *Mueller v. Penobscot Valley Hospital*, 538 A.2d 294, 299 (Me. 1988)). Aetna further contends that "[a]ll of [Ms.] Brown's causes of action arise out of her employment contract with [BOA]," that "Aetna was not a party to any contract with [Ms.] Brown," and that it therefore "cannot be liable for [BOA's] decisions regarding the conditions or decision to terminate [Ms.] Brown's employment." *Id.* (citing *Cardente v. Fleet Bank of Me., Inc.*, 796 F. Supp. 603, 613 (D. Me. 1992)).

### 2. Ms. Brown

Ms. Brown first disputes Aetna's contention that it is not a "covered entity" under the ADA; in her view, Aetna is an "employer" within the meaning of the ADA because the Amended Complaint alleges that Aetna was BOA's "agent." *Pl.'s Opp'n* (citing 42 U.S.C. ¶ 1211(5)(A)). She disputes that the Amended Complaint must plead the elements of common law agency, as Aetna argues, *id.* at 4; she views it as sufficient for the Amended Complaint to simply allege that Aetna was an "agent." After distinguishing certain cases cited by Aetna, Ms. Brown argues that under

First Circuit precedent, an "agent" of a "covered entity" may be treated as an "employer" if it acts on behalf of the actual employer in "providing and administering employee health benefits." *Id.* at 6 (citing *Carparts Distrib. Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 17-18 (1st Cir. 1994)).

Ms. Brown next disputes whether Aetna falls into the ADA's safe harbor provision as the administrator of a bona fide benefit plan not subject to state insurance law. *Id.* at 9. Although she "agrees that Aetna is not subject to Maine laws regulating insurance," she views her claim as bringing Aetna outside the safe harbor because "she is suing for . . . violations of state laws regulating human rights, including disability discrimination." *Id.* She claims that Aetna did more for BOA than simply administer an insurance plan for short-term disability; rather, Aetna was responsible for determining how much disability leave was appropriate, whether her proposed accommodation was "reasonable," and when her leave should end. *Id.* She argues that these tasks are governed, not by insurance laws, but by the ADA and the Maine Human Rights Act. *Id.*

Finally, Ms. Brown argues that she has sufficiently alleged an agency relationship between Aetna and BOA. *Id.* at 11-12. She disagrees that the meaning of the word "agent" in the ADA should be governed by state common law of agency. *Id.* In any event, she contends, the Amended Complaint sets out facts sufficient to allege an agency relationship, *id.* at 12 (citing *Am. Compl.* ¶¶ 34, 59), and notes that BOA's answer to the Amended Complaint "agreed that it had authorized Aetna to handle leave of absence claims for it." *Id.*

### 3. Aetna's Reply

Aetna, in its Reply, first disagrees with Ms. Brown's contention that she sufficiently pleaded an agency relationship. *Def.'s Reply* at 1-5. It renews its argument that the mere allegation that Aetna is an "agent" of BOA is legally insufficient. *Id.* at 1-2. It also disputes that the factual allegations of the Amended Complaint satisfy the elements of an agency relationship. *Id.* at 2-4. At most, Aetna argues, the Amended Complaint "describe[s] Aetna performing its limited functions as [BOA's] leave administrator." *Id.* at 3. It characterizes these activities as "ministerial in nature," and "not the kind of final discretionary determinations contemplated by the agency argument [Ms. Brown] advances." *Id.*

Aetna further denies that it had the authority to give Ms. Brown the reasonable accommodations that she complains BOA withheld. *Id.* at 4. It concludes by disputing Ms. Brown's interpretation of *Carparts* and other cases. *Id.* at 5-7.

### B. Discussion

#### 1. Whether Aetna was Ms. Brown's "Employer"

A legal claim of employment discrimination requires employment. Title I of the Americans With Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327 (codified as amended at 42 U.S.C. §§ 12101 *et seq.*) (ADA), provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "covered entity"

is "an employer, employment agency, labor organization, or joint labor management committee." *Id.* § 12111(2). The ADA defines an "employer," in relevant part, as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person." 42 U.S.C. § 12111(5)(A). An "employee" is "an individual employed by an employer." *Id.* § 12111(4).

Title I of the ADA contains several safe harbors, of which one is particularly relevant to Aetna. The Act does not "prohibit . . . a[n] . . . organization covered by [the Act] from . . . administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance." 42 U.S.C. § 12201(c), (c)(3).

Here, Aetna argues that it is not a "covered entity" under the ADA, meaning that it may not be held liable for employment discrimination because it did not employ Ms. Brown. *Def.'s Mot.* at 8. Aetna correctly notes that Ms. Brown does not allege any of the common indicia of employment; she does not claim that Aetna hired her, directed her work, or paid her. *Compl.* at 1-17. The question narrows to whether, under the statutory definition in 42 U.S.C. § 12111(5)(A), Aetna was constructively Ms. Brown's "employer" as an agent for BOA.

Both parties rely heavily on *Carparts*, a First Circuit case from 1994. In that case, an automotive parts wholesale distributor contracted with health benefits plan providers to offer its employees a medical reimbursement plan. *Carparts*, 37 F.3d at 14. The distributor alleged that the plan providers had improperly limited the benefits available to an employee in violation of Title I of the ADA; the providers

defended on the ground that they were not "covered entities" under Title I. *Id.* at 15. The *Carparts* Court reversed a dismissal by the district court, holding that any of three legal theories might cause the plan providers to be the "employer" of the distributor's employee under the ADA. *Id.* at 16. The Court of Appeals instructed the district court to permit the plaintiff, if possible, to amend the complaint to show facts that would fit into any of these three theories. *Id.*

The *Carparts* Court described the three potential theories: (1) the exercise of control theory; (2) the agent of the employer theory; and (3) the interference theory. *Id.* at 16-18. The first of the three *Carparts* theories under which a plan provider could be an employer was if it "exercised control over an important aspect of his employment." *Id.* at 17. The Court explained:

> If [the plan providers] exist solely for the purpose of enabling entities such as Carparts to delegate their responsibility to provide health insurance for their employees, they are so intertwined with those entities that they must be deemed an "employer" for purposes of Title I of the ADA. . . . Relevant to this inquiry is whether defendants had the authority to determine the level of benefits that would be provided to Carparts' employees and whether alternative health plans were available to employees through their employment with Carparts. If defendants had the authority to determine the level of benefits, they would be acting as an employer who exercises control over this aspect of the employment relationship. Also relevant to this determination is whether Carparts shares in the administrative responsibilities that result from its employees' participation in [the plans]. Such sharing of responsibilities would tend to suggest that Carparts and defendants are so intertwined as to be acting together as an "employer" with respect to health care benefits.

*Id.* (internal footnotes and citations omitted). The second theory was one suggested by the text of the statute: if the plan providers were "agents of a covered entity, who act on behalf of the entity in the matter of providing and administering employee

health benefits." *Id.* (internal footnotes omitted). The third theory ascribed employer status to the plan providers if they interfered with the "aspects of employment" enumerated in 42 U.S.C. § 12112(a). *Id.* at 18. However, the *Carparts* Court expressed some hesitation about this theory, stopped short of formally adopting it, and a later First Circuit case disavowed it. *Id.*; *Lopez v. Massachusetts*, 588 F.3d 69, 89 (1st Cir. 2009) ("The interference theory has no basis in our circuit law, has never been adopted by this circuit, and contradicts Supreme Court case law. We flatly reject it now").

The *Carparts* Court observed that "[t]here is no significant difference between the definition of the term 'employer'" in Title I of the ADA and Title VII of the Civil Rights Act of 1964 (Title VII). *Id.* at 16 (citing 42 U.S.C. § 2000e(b)).[12] Furthermore, the Court looked to case law and administrative publications interpreting Title VII for guidance in construing the term "employer" in Title I of the ADA. *Id.* at 16-18.

In 2009, in addition to rejecting the "interference" theory, the First Circuit called sharply into question an expansive reading of the word "employer." *Lopez v. Massachusetts*, 588 F.3d 69, 83-90 (1st Cir. 2009). In *Lopez*, plaintiff police officers brought a Title VII claim against the Massachusetts Human Resources Division (HRD), a public agency tasked with developing tests to govern promotions within the Commonwealth's civil service. *Id.* at 72. State municipalities could elect to use

---

[12] Under Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b).

these tests to generate a candidate pool for promotion of police officers to the rank of sergeant; the plaintiffs claimed that the tests resulted in promotion of only a very small number of minority police officers. *Id.* at 72-80. Although HRD did not, strictly speaking, employ the plaintiff police officers, the plaintiffs argued that HRD was subject to the requirements of Title VII because it was an "employer" within the meaning of the Civil Rights Act. *Id.* at 83.

The district court denied HRD's motion to dismiss the suit, but the First Circuit reversed. *Id.* at 72-73. Citing numerous Supreme Court opinions interpreting Title VII, the First Circuit concluded that "common law agency doctrine" controls the meaning of "employee" and "employer" in the Civil Rights Act. *Id.* at 84. The *Lopez* Court also followed Supreme Court precedent and looked to the Equal Employment Opportunity Commission's then-current Compliance Manual (EEOC Compliance Manual) for fifteen factors for determining whether a person was an employee.[13] *Id.* at 85 (citing *Clackamas Gastroenterology Assocs.,*

---

[13] According to the *Lopez* Court,

[t]hose guidelines, in their current form, list the following, non-exhaustive factors as indications that "a worker is in an employment relationship with an employer": "[t]he employer has the right to control when, where, and how the worker performs the job;" "[t]he work does not require a high level of skill or expertise;" "[t]he work is performed on the employer's premises;" "[t]here is a continuing relationship between the worker and the employer;" "[t]he employer has the right to assign additional projects to the worker;" "[t]he employer sets the hours of work and the duration of the job;" "[t]he worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job;" "[t]he worker does not hire and pay assistants;" "[t]he work performed by the worker is part of the regular business of the employer;" "[t]he employer is in business;" "[t]he worker is not engaged in his/her own distinct occupation or business;" "[t]he employer provides the worker with benefits such as insurance, leave, or workers' compensation;" "[t]he worker is considered an employee of the employer for tax purposes;" "[t]he employer can discharge the worker;" and "[t]he worker and the employer believe that they are creating an employer-employee relationship."

*P.C. v. Wells*, 538 U.S. 440, 444-47 (2003) and Equal Employment Opportunity Comm'n, 2 *EEOC Compliance Manual* § 2-III, at 5716-17 (2008)). The First Circuit further observed that "[t]he Supreme Court has not recognized any other possible means of interpreting either the term 'employee' or the term 'employer' under Title VII and has rejected broader readings." *Id.* at 86. Applying these principles, the Court found that HRD was not an "employer" under Title VII, *id.* at 85-86.

The First Circuit considered and rejected the plaintiffs' suggestion that HRD must be an "employer" if it "controls even one significant aspect of . . . employment," as described in *Carparts*. *Id.* at 88 (citing *Carparts*, 37 F.3d at 17-18). This was the first of the three *Carparts* theories. *See Carparts*, 37 F.3d at 17 ("[D]efendants would be 'employers' if they functioned as [plaintiff's] 'employer' with respect to his employee health care coverage, that is, if they exercised control over an important aspect of his employment"). However, the *Lopez* Court did not categorically rule out the possibility that an entity could be an "employer" under this theory; it interpreted *Carparts* as holding that dismissal of that case was inappropriate without further factual development. *See Lopez*, 588 F.3d at 88. With the benefit of a summary judgment record, the *Lopez* Court saw no need for further factual development to rule out the first *Carparts* theory.

Even if HRD were not the police officers' "employer" under the common law test, it could still have been liable as an "employer" under the ADA if it were an "agent of" such an employer. 42 U.S.C. § 12111(5)(A). Although they did not use

---

*Lopez*, 588 F.3d at 85 (quoting 2 Equal Employment Opportunity Comm'n, EEOC Compliance Manual, § 2-III, at 5716-17 (2008)).

the term "agent", the *Lopez* petitioners claimed that the HRD was the "de facto" employer of the aggrieved police officers.[14] *Lopez*, 588 F.3d at 86. The *Lopez* Court rejected this argument, observing that "[t]he facts here weigh . . . strongly against the state being the 'employer' of the plaintiffs. The First Circuit pointed out that HRD exercised no control, direct or indirect, over the factors relevant to the common law agency test." *Lopez*, 588 F.3d at 87. The Court reached this conclusion by reasoning that the promotion exam was optional for the defendant municipalities; they could choose instead to develop and use their own exams, and even if using the HRD exam they still had the discretion to choose which officers to promote. *Id.*

The *Lopez* Court also stated that "[t]he de facto test [for an 'employer'] is the same as the common law test and stresses the importance of actual circumstances of an entity's overall control over key aspects of an employment relationship with a particular set of putative employees." *Id.* at 86. This assertion must be understood in context; both Title VII and ADA Title I include "any agent of such a person" in the definition of "employer." 42 U.S.C. § 2000e(b); 42 U.S.C. § 12111(5)(A). The *Lopez* Court's rejection of a distinct "de facto" test means only that there is no separate set of analytic steps to follow when evaluating whether a third party is an "agent" of an employer for the purpose of discrimination law. *Lopez* directs courts to use all available facts and circumstances to determine whether the putative "agent"

---

[14]    In analyzing the petitioners' argument that HRD was a "de facto" employer, *Lopez* did not directly discuss the "any agent of such a person" language in 42 U.S.C. § 2000e(b), the analogous definitional section of Title VII. However, the two issues are analytically identical. The "agent of" language imputes employer status to a third party who does not formally employ the aggrieved worker, just as would the "de facto employer" test that the petitioners advanced in *Lopez*.

exercises enough influence over the "factors relevant to the common law agency test" to be constructively deemed an "employer."[15]  *Id.* at 87.

In *Camacho v. Puerto Rico Ports Authority*, 369 F.3d 570 (1st Cir. 2004), discussed in *Lopez*, the First Circuit held that a harbor pilot licensing authority was not an "employer" of harbor pilots, even though it could issue or revoke their licenses, set out work procedures, and helped to create and administer a retirement plan for the pilots.  *Id.* at 576-78.  This control over the employment conditions was insufficient because the pilots "retained control over many of the relevant indicia of employment under the common law test," such as providing their own tools and training and controlling their own schedules.  *Id.* at 576-77.  Furthermore, the licensing authority could neither hire nor fire the pilots, and did not treat the pilots as employees for tax purposes.  *Id.* at 577.  Its actions were "purely ministerial with respect to [the retirement plan's] administration."  *Id.* at 577.

More recently, the First Circuit addressed the issue of a putative "employer" in *DeLia v. Verizon Communications Inc.*, 656 F.3d 1 (1st Cir. 2011).  In *DeLia*, a formal employee of a wholly owned subsidiary sued Verizon, the parent of the parent of the parent of her formal employer.  *Id.* at 2-3.  Despite this layered ownership, Verizon directly administered (but did not fund) the plaintiff's employee benefits.  *Id.* at 5.  The First Circuit observed that "providing employee benefits is

---

[15]     The putative "agent" must, of course, meet the other requirements for common law agency in addition to the requirements established in *Lopez*.  That is, there must be authorization by the principal, consent by the agent, and control by the principal.  *Koshy*, 2010 ME 44, ¶ 16, 995 A.2d 651. There can be no serious dispute in this case that Aetna was, within a certain scope, an agent of Bank of America.  *Am. Compl.* ¶ 34 ("[Bank of America] had authorized Aetna to handle disability and FMLA claims for [Bank of America]").

an indicium of employee status," *id.* (citing *Alberty-Velez v. Corporacion de Puerto Rico Para la Difusion Publica*, 361 F.3d 1, 6 (1st Cir. 2004)), but the Court distinguished between paying benefits and administering benefits. *Id.* Considering all of the other facts and circumstances available in the record, the Court upheld the district court's grant of summary judgment to Verizon because the plaintiff "failed to demonstrate that Verizon had any control over the manner and means by which she performed her job." *Id.* (internal quotations omitted). The Court emphasized that "'the common-law element of control [by the putative employer over the putative employee] is the principal guidepost that should be followed'" to determine when a person is an "employee" under Title VII. *Id.* at 4 (quoting *Lopez*, 488 F.3d at 84-85).

These cases establish the central features of the analytical framework for Aetna and Ms. Brown. First, "employer" under Title I of the ADA has the same meaning as "employer" under Title VII of the Civil Rights Act. *Lopez*, 588 F.3d at 84; *Carparts*, 37 F.3d at 16. Second, the First Circuit's rejection of the third *Carparts* theory of constructive "employer" status leaves only the first and second— the exercise of control theory and the agency theory. *Lopez*, 588 F.3d at 87-88; *Carparts*, 37 F.3d at 17-18; 42 U.S.C. § 12111(5)(A). Third, common law agency principles govern the analysis of whether Ms. Brown is directly an employee of Aetna. *Lopez*, 588 F.3d at 84-85. Fourth, the factors in the EEOC Compliance Manual guide the analysis of whether Aetna "controlled" Ms. Brown for the purposes of common law agency. *Id.* at 84; *Clackamas*, 538 U.S. at 448. Finally,

assuming Ms. Brown was directly employed by BOA and not Aetna, Aetna will only be liable as an "agent"[16] of BOA if either: (1) the bulk of the "relevant indicia of employment" are within Aetna's control, *Lopez*, 588 F.3d at 86-88; *Camacho*, 369 F.3d at 576-78; or (2) Aetna exercised control over one aspect of Ms. Brown's employment so significant that it was "intertwined" with BOA for the purposes of the ADA. *Carparts*, 37 F.3d at 17.

Ms. Brown does not argue that the Amended Complaint pleads facts that would make her a common-law employee of Aetna under traditional agency principles.[17] She relies instead on the theory that Aetna can be held liable as Bank of America's "agent" if Aetna acted on Bank of America's behalf in "providing and administering employee health benefits." *Pl.'s Opp'n* at 6. She offers paragraphs 34, 47-50, 58-59, 62, 74, and 94 of the Amended Complaint as fulfilling the requirements of agency. *Pl.'s Opp'n* at 2-3, 11-12.

These portions of the Amended Complaint sufficiently establish that Aetna might have been Ms. Brown's "employer" under the First Circuit's analytic

---

[16]    It is important to recognize that there are *two* potential agency relationships implicated by this framework. An agency relationship between Aetna and Ms. Brown would establish Ms. Brown as Aetna's common law employee; this, in turn, might expose Aetna to liability as "a person engaged in an industry affecting commerce who has . . . employees." 42 U.S.C. § 12111(5)(A). Additionally, however, Aetna might be "any agent of such a person [who employs employees, here Bank of America]." *Id.* If it were such an agent, it would also be an "employer" under § 12111(5)(A). To determine this second agency relationship, *Lopez* and *Camacho* require the Court to examine whether Aetna had control over a sufficient number of the "relevant indicia of employment." *Lopez*, 588 F.3d at 87. These "indicia of employment" are the very factors used to evaluate whether there was a direct employer-employee relationship under the first type of agency; if Aetna controls enough of them, it could be considered an "employer" under 42 U.S.C. § 12111(5)(A).

[17]    To succeed on this theory, Ms. Brown would have to establish that Aetna authorized Ms. Brown to be its agent, that Ms. Brown consented to agency, and that Aetna exercised control over Ms. Brown. *Koshy*, 2010 ME 44, ¶ 16, 995 A.2d 651. The Amended Complaint claims none of these things, and Ms. Brown does not now argue that they exist.

framework. The Amended Complaint alleges that "BOA had authorized Aetna to handle disability and FMLA claims for BOA." *Am. Compl.* at ¶ 34. It also alleges that BOA directed Ms. Brown to provide information to Aetna "to justify continued leave," *id.* at ¶ 47, and that Aetna interacted with Ms. Brown and directed the information she was to produce. *Id.* at ¶ 50. Critically, if cryptically, it alleges that Aetna informed BOA "that Brown was being placed on 'LOA-closed' status" and "direct[ed] BOA to take action within three days." *Id.* ¶ 59. These allegations do not show, under *Camacho* and *Lopez*, that Aetna controlled the bulk of the indicia of Ms. Brown's employment. However, drawing all reasonable inferences in favor of Ms. Brown, it may well be that Aetna was "interwined" with BOA with respect to Ms. Brown's employee benefits, and that those benefits were a significant enough aspect of her employment, to meet the first *Carparts* test. *Lopez* did not foreclose the possible application of this test; it merely found it inapplicable on the facts then before the Court.

The overriding lesson from *Carparts* is that the issue of who is an "employer" will rarely be resolved on a motion to dismiss. The *Carparts* case had some unique procedural aspects, but the *Carparts* Court ruled only that "we think it premature to rule out the possibility that when additional facts are developed, a claim under Title I . . . might be made out." *Carparts*, 37 F.3d at 18. Although it is possible to be successful in a motion to dismiss on the issue of employment—and in fact *Lopez* addressed a motion to dismiss—almost all reported decisions within the First Circuit since *Lopez* have resolved this question on motions for summary judgment.

*Delia*, 656 F.3d at 3 ("We review the district court's grant of summary judgment de novo"); *Barton v. Clancy*, 632 F.3d 9, 11 (1st Cir. 2011) ("Plaintiff Gordon Barton appeals from the district court's grant of summary judgment . . . ."); *Roberts v. Delta Air Lines, Inc.*, 599 F.3d 73, 74 (1st Cir. 2010) ("On appeal, Roberts argues the district court erred in granting summary judgment . . . ."); *Bentley v. City of Lebanon*, No. 10-cv-470-PB, 2012 U.S. Dist. LEXIS 176642, *2 (D.N.H. Dec. 13, 2012); *Andujar-Igelsias v. D'Mart Inst., Inc.*, Civil No. 09-1918 (JAG), 2012 U.S. Dist. LEXIS 58873, *1 (D.P.R. Apr. 25, 2012). In cases where the courts addressed motions to dismiss or motions for judgment on the pleadings, the moving party has been often, though not invariably, unsuccessful. *See Santiago-Ortiz v. Pub. Broad. Serv.*, Civil No. 12-1964 (JAF), 2014 U.S. Dist. LEXIS 16620, *1, 10 (D.P.R. Feb. 4, 2014); *Melendez-Fernandez v. Special Care Pharm. Servs.*, Civil No. 11-1662 (SEC), 2012 U.S. Dist. LEXIS 146705, *1-2, 20 (D.P.R. Oct. 10, 2012). *But see Scott v. N.H. Police Standards & Training Council*, No. 12-cv-435-PB, 2013 U.S. Dist. LEXIS 59112, *1 (D.N.H. March 8, 2013) (motion to dismiss granted against pro se litigant who sued the police academy after he failed its fitness test for new police officers); *Masso v. City of Manchester*, No. 11-cv-370-JL, 2012 U.S. Dist. LEXIS 42457, *2-3 (D.N.H. Mar. 28, 2012) (motion for judgment on the pleadings partially granted).

Nor is this surprising. The *Lopez* reference to the multiple criteria in EEOC regulations for the determination of employer status makes clear that this assessment is highly fact-bound. Where a complaint alleges that a defendant is an employer or agent under the ADA, the allegation alone is typically sufficient to

withstand dismissal.  If a defendant contends that it is neither the employer nor agent, the wiser course is for the parties to engage in discovery, isolate undisputed and disputed facts, and present the issue as a matter of law based on a fully developed factual record.

### 2. Whether Aetna Was Within a Safe Harbor

This does not end the discussion.  Aetna says that it is protected from ADA and MHRA suit under the so-called "safe harbor" provision of both federal and state law.  *Def.'s Mot.* at 11-13 (citing 42 U.S.C. § 12201(c); ME. REV. STAT. tit. 5, § 4554(2)).  Aetna maintains that "[t]o the extent that the Court interprets the Amended Complaint to state facts alleging that Aetna violated the ADA or the MHRA based on its administration of [Ms.] Brown's claim for benefits, Aetna is not subject to liability under the ADA or the MHRA based on the statutes' safe harbor provisions."  *Id.*

Ms. Brown responds by stressing that she is not making a claim against Aetna based on its administration of short-term disability benefits.  *Pl.'s Opp'n* at 9. She emphasizes that Aetna did not merely handle BOA's short-term disability insurance plan, but she claims Aetna "handled all types of leaves of absence, including leave required under the ADA and the MHRA for those with disabilities." *Id.*  She alleges that "[i]t was Aetna's job to determine how much disability leave under the ADA and the MHRA was appropriate, whether it was a reasonable accommodation under the circumstances, and when it should end." *Id.*

A safe harbor for insurers within the ADA is found in 42 U.S.C. § 12201(c)(3), which provides that Title I of the ADA "shall not be construed to prohibit or restrict.

. . a[n] . . . organization covered by [the Act] from . . . administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance." 42 U.S.C. § 12201(c), (c)(3). Ms. Brown has conceded that "Aetna is not subject to Maine laws regulating insurance." *Pl.'s Opp'n* at 9. She has not alleged that, in providing short-term disability benefits, Aetna engaged in subterfuge. *Am. Compl.* at 1-17. Accordingly, Aetna has a strong case for dismissal under the safe harbor provisions to the extent it is able to demonstrate that it was merely administering a "bona fide benefit plan." *Fitts v. Fed. Nat'l Mortg. Ass'n*, 236 F.3d 1, 3-4 (D.C. Cir. 2001); *Pallozzi v. Allstate Life Ins. Co.*, 204 F.3d 392, 392 (2d Cir. 2000) ("[B]y virtue of the safe harbor, the ADA has no application so long as the insurer conforms to state law and does not engage in subterfuge").

But Ms. Brown's contention against Aetna is different. She frankly concedes that she has "not challenge[d] or sue[d] regarding the decision to deny her short term disability benefits." *Pl.'s Opp'n* at 9. Instead, she claims that BOA charged Aetna with handling "all types of leaves of absence, including leave required under the ADA and the MHRA for those with disabilities." *Id.*; *Am. Compl.* ¶ 4 ("Aetna was specifically authorized by BOA to handle requests for leave and other accommodations for BOA and to gather medical information from employees for such purposes"); *Am. Compl.* ¶ 34 ("BOA had authorized Aetna to handle disability and FMLA claims for BOA"). As the Court interprets Ms. Brown's contention, she is not making an ADA claim against Aetna for its administration of the short-term disability program; rather, she is alleging that BOA delegated to Aetna certain

personnel functions normally handled by an employer, such as whether an employee's level of disability justified a leave of absence and whether BOA should accommodate the claimed disability. *Pl.'s Opp'n* at 9. Furthermore, once Aetna made this decision for BOA, Ms. Brown alleges that it failed to engage in an interactive process. *Id.* at 10 (quoting *Am. Compl.* ¶ 71). These allegations, accepted as true, place Aetna outside the ADA's and the MHRA's safe harbors, because Ms. Brown is not claiming that Aetna violated the ADA or the MHRA as a plan administrator, but as an employer.

Based on the contents of Aetna's pending motion, the Court strongly suspects that BOA and Aetna do not agree with Ms. Brown in the way she has described their respective roles. Nevertheless, for purposes of a motion to dismiss, the Court must accept as true the facial allegations in Ms. Brown's Amended Complaint, and as with Aetna's status as Ms. Brown's employer, the Court may not resolve factual allegations at this stage. Again, it seems wiser to allow the parties to engage in discovery and see whether there remain genuine disputes as to material facts on these issues.

### 3. Conclusion

The Amended Complaint alleges facts sufficient to make Aetna the agent of Ms. Brown's employer under Title I of the ADA. As Ms. Brown has framed her allegations, Aetna, as an "employer," falls outside the safe harbor provision for administration of a bona fide benefits plans not subject to state insurance law. The Court therefore denies Aetna's Motion to Dismiss as to Count I.

## IV. COUNT II: MHRA DISABILITY DISCRIMINATION

The Maine Human Rights Act, ME. REV. STAT. tit. 5, §§ 4551 *et. seq.* (MHRA) provides that

> [a] covered entity may not discriminate against a qualified individual with a disability because of the disability of the individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training and other terms, conditions and privileges of employment.

*Id.* § 4572(2). A "covered entity" is "an employer, employment agency, labor organization or joint labor-management committee." *Id.* § 4553(1-B). An "employer" is "any person in this State employing any number of employees . . . [and] any person acting in the interest of any employer, directly or indirectly." *Id.* § 4553(4). An entity may be liable for unlawful discrimination if it aids and abets another in committing such discrimination. *Id.* § 4553(10)(D). Courts construe and apply the MHRA "along the same contours as the ADA." *Dudley v. Hannaford Bros., Inc.*, 333 F.3d 299, 312 (1st Cir. 2003).

The parties' positions with regard to Count II echo their positions with regard to Count I. Aetna argues that it was not an "employer" of Ms. Brown within the meaning of the statute. *Def.'s Mot.* at 10-11. Ms. Brown argues that Aetna "has taken over employer functions of [BOA] in terms of leaves of absence," and so Aetna was "acting as a separate company directly making employment decisions about [Ms.] Brown." *Pl.'s Opp'n* at 8. She also contends that Aetna could be liable for aiding and abetting BOA's unlawful discrimination under ME. REV. STAT. tit. 5, § 4553(10)(D). Aetna, in reply, disputes that the Amended Complaint alleges facts sufficient to show any such aiding and abetting. *Def.'s Reply* at 4.

Count II survives dismissal for the same reasons Count I survives dismissal. Construing the MHRA along the same contours as the ADA, Ms. Brown has sufficiently alleged that Aetna assumed control over a significant aspect of Ms. Brown's employment with BOA. That Aetna was not Ms. Brown's formal employer does not undermine these allegations; Aetna may be liable under the MHRA if it acted directly in the interest of BOA when it made the allegedly unlawful acts. ME. REV. STAT. tit. 5, § 4553(4). It also may be liable if it aided and abetted BOA in performing the unlawful discrimination. *Id.* § 4553(10)(D). The allegations of the Amended Complaint, taken as true and with all reasonable inferences drawn in favor of Ms. Brown, rise to either standard. *See Am. Compl.* ¶¶ 4, 34, 50, 59, 62.

Aetna also argues that ERISA completely preempts Ms. Brown's MHRA claim. *Def.'s Mot.* at 14-16. This argument rests on Aetna's theory that it cannot be Ms. Brown's "employer" for the purpose of the ADA or MHRA. *Id.* at 14. However, the Court does not accept that proposition. Section III.B.1, *supra*. ERISA does completely preempt claims under state law for lost employment benefits, *Aetna Health Inc. v. Davila*, 542 U.S. 200, 206 (2004), but it does not preempt claims arising under state human rights laws. Because Ms. Brown may proceed against Aetna under the MHRA as her "employer" rather than merely as a benefits administrator, her claim under the MHRA is a disability discrimination claim, not

an employee benefits claim—and ERISA does not preempt disability discrimination claims.[18]

## V.    COUNT III:  MAINE PERSONNEL FILES LAW

Another Maine statute provides that

> The employer shall, upon written request from an employee or former employee, provide the employee, former employee or duly authorized representative with an opportunity to review and copy the employee's personnel file if the employer has a personnel file for that employee. . . In each calendar year, the employer shall provide, at no cost to the employee, one copy of the entire personnel file when requested by the employee or former employee and, when requested by the employee or former employee, one copy of all the material added to the personnel file after the copy of the entire file was provided.

ME. REV. STAT. tit. 26, § 631.

### A.    Position of the Parties

Aetna argues that the plain language of the statute imposes liability on "employer[s]," not on benefit claims administrators.  *Def.'s Mot.* at 13.  Aetna also argues that it had no responsibility for maintaining any personnel files, nor any means to do so.  *Id.* at 13-14.

In response, Ms. Brown argues first that BOA directed her to send medical records to Aetna, in effect delegating its own responsibility to maintain personnel files to Aetna.  *Pl.'s Opp'n* at 13.[19]  She also argues that "Maine law does not exclude companies such as Aetna from coverage as an employer."  *Id.*  She suggests that the

---

[18]    Ms. Brown lists, in the ad damnum clause of her complaint, damages for "lost pension, health, Social Security, and other benefits in amounts to be shown at trial." *Am. Compl.*  The Court need not resolve at the summary judgment stage whether Ms. Brown could be awarded such damages under any state law cause of action.

[19]    She also suggests, without citation to the Amended Complaint, that Aetna demanded certain employee records directly from BOA, and BOA provided them to Aetna.  *Pl.'s Opp'n* at 13.  The Amended Complaint does not appear to support this claim.

definition of "employer" includes, for instance, a "legal representative." *Id.* (citing ME. REV. STAT. tit. 26, § 591(2)). She concludes that Aetna falls into the definition of "employer" because she alleges that it was legally authorized to demand and keep employee documents and to directly contact employees. *Id.* at 13-14.

In reply, Aetna points to the definition of "employee" within the Maine statute: "'every person who may be permitted, required or directed by any employer in consideration of direct or indirect gain or profit, to engage in any employment." *Def.'s Reply* at 4. In Aetna's view, the definition of "employer" and "employee" make Maine's personnel law flatly inapplicable to Aetna. *Def.'s Mot.* at 13-14; *Def.'s Reply* at 4. Aetna offers no other argument as to why it should not produce the records described in the Amended Complaint.

## B. Discussion

Count III survives dismissal because Ms. Brown has sufficiently alleged that Aetna was a "legal representative" of her formal employer, BOA. The Amended Complaint alleges that BOA contracted with Aetna to administer its disability and FMLA claims, *Am. Compl.* ¶ 34, and that Aetna had repeated direct contact with Ms. Brown in carrying out that mandate. *Id.* ¶¶ 34, 40-43, 47, 50, 56-58, 62. In this context, as with the ADA and MHRA, whether an entity is an "employer" is fact-intensive and normally not well suited for disposition in a motion to dismiss. *See, e.g.*, *Murtagh v. St. Mary's Reg'l Health Ctr.*, No. 1:12-CV-00160-NT, 2013 WL 5348607 at *9-10 (D. Me. Sept. 23, 2013) (unreported) (denying a motion to dismiss where the record showed a factual dispute as to whether the employee was an independent contractor under ME. REV. STAT. tit. 26, § 591). If Ms. Brown can

produce facts to support the allegations of the Amended Complaint, a fact-finder could reasonably conclude that Aetna was a legal representative of BOA with respect to Ms. Brown's disability leave and the records pertinent to it. If that were the case, then Maine's personnel files law would require Aetna to produce those records to Ms. Brown at her request. ME. REV. STAT. tit. 26, § 631.

## VI. CONCLUSION

The Amended Complaint raises allegations that, if proven, could expose Aetna to liability for unlawful discrimination under the ADA and MHRA as an "agent" of Ms. Brown's formal employer, BOA. The Amended Complaint also sufficiently alleges that Aetna was a "legal representative" of BOA with respect to Ms. Brown's disability leave, such that it would have been legally required to produce at least the relevant portions of her personnel file under ME. REV. STAT. tit. 26, § 631. The Court DENIES Defendant Aetna's Motion to Dismiss (ECF No. 18).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 7th day of March, 2014